v. Williams v. David Wayne, Case No. 517-0228. Counsel ready? You may proceed. May it please the Court. My name is Jillian Wood. I'm here on behalf of the appellant and respondent in this case, David Williams. Your Honors, this case is about how the trial court in this matter misapplied the law as it applies to relocation and as to modifications of parenting responsibilities. It also involves how the Court ignored and, in several instances, misstated the facts and the underlying testimony and evidence that was presented before the Court as it relates to its findings as to the relocation of the minor children to the State of North Carolina, and also how the trial court ignored the plain language of the agreed orders that were entered in this case with respect to the issues of child support and the issue of attorney fees and costs. For these reasons, we're asking the Court to reverse the trial court's decisions on these matters and remand them back to the trial court. The Court is familiar with the facts of this case, so I want to proceed to our first point on appeal, which is that the Court misapplied the law as to – I apologize, Your Honor. Sure, absolutely. They also proved that there had been a substantial change of circumstances. Now, the Court made this ruling as to David's motion to modify. There's a little bit of a conflict here in terms of what the trial court ruled orally and then what the trial court wrote. In its oral ruling from the bench, the trial court stated essentially that neither party had proven that there was a substantial change in circumstances. David had pled that he wanted more time with the children. The Court had found that, you know, David wanted more time in the trial court. He had not shown that he'd been consistently asking for more time. On the flip side, the Court also made a – in its oral ruling discussed how Ms. Balmer, Mary Mill, in this case, the mother of the children, also had not demonstrated change of circumstances in that she had lived here, she'd made it work, everything was going fine. That wasn't a change either. So we got some conflict there. But the Court also made a ruling that David had not demonstrated change of circumstances. I'm sorry? That David had failed to prove that. David had. But what about – we've got this petition to relocate. Isn't that the driving issue? That is exactly the – the Court has hit the nail on the head there because 609.2, which is the new relocation statute, states specifically that a parent's relocation constitutes a substantial change of circumstances for purposes of 610.5. So in this case, if you have a relocation event, the way that the statute reads, that is a change of circumstances. We are under a change of circumstances now at this point. Now, the question as to what is going to be in the best interest of the children, whether to allow the relocation or to modify the parenting plan in some way, is another matter for the Court to determine. But as to did David show that there was a substantial change in circumstances, yes. The filing of the relocation in and of itself was a change of circumstances that met the modification statute's substantial change in circumstances burden. In other words, that element was met. As to whether or not David had, you know, demonstrated that there had been – that his modification was going to be in the children's best interest, that was another issue. But in that particular instance, we're also arguing as well that the trial court must apply the law as to that as well. In terms of a modification when you're dealing with parenting time, so obviously parenting responsibilities and we're specifically focused on parenting time, because that is what David requested in his modification. He wanted an increase in parenting time, essentially substantially equal time. The Court in this case did not undergo any analysis of the best interest factors as it relates to allocation of parenting time. As we're all well aware and the Court is well aware, there are 17 factors that are in play in that. And unfortunately, when the Court discussed the rejection of David's modification, it really only focused on one issue, and that was really expressed in the Court's oral ruling, where the Court really discussed that David had not demonstrated that he'd been consistently asking for more time. On the contrary, David's motion to modify specifically requested that he wanted more time. He obviously proceeded on that at trial. That was his position consistently throughout the case. But here, the Court focused on instead of factors under 607.5, the parenting time statute, didn't talk about any of those factors, didn't talk about under the relocation statute factor whether or not David had substantially exercised his time. In other words, had he demonstrated he'd exercised his time. The Court found that he had done that. Rather, the Court focused on this question as to whether or not he had proven through either a stack of e-mails or other method that he consistently wanted more time with his kids. And the Court said, it's not sufficient for you to just plead it in your motions to come here and ask for it. That's not sufficient. The Court wanted to see other significant evidence. The problem with that is that's not one of the factors under any of these statutes, whether or not a parent is consistently asking more time. And I would suggest to the Court that if it's that simple, I think our modification cases would be a lot easier, because I could advise all of my clients to just simply ask and consistently ask every single day after the judgment's  So I think the Court is right in this sense. The Court misapplied the law as it applies not only to whether or not a relocation constitutes a substantial change of circumstances but also as to, you know, if the Court's analysis and review of David's motion to modify his parenting time. That brings us to our second point on appeal, which is that we believe that the totality of the evidence and the testimony that was presented, the Court essentially the decision was against the manifest weight of the that there were significant, I think, facts and circumstances that were left out of the Court's determination, and that also there were instances where the facts and circumstances and the findings that the Court made were misstated based on the testimony and the evidence that was presented before the Court. Our brief goes through a very significant detailed analysis of each factor that we believe, and I think there's some themes here that I wanted to focus on for the Court today in terms of some repeating things that you've seen throughout all of these factors. One in particular is, again, David is again, in the Court's analysis of relocation, faulted for not consistently asking for more time with these children. When the evidence and testimony was to the contrary, if anything, David brought forward e-mails, he brought forward e-mail evidence that he was consistently asking for more time. Well, he did ask for more time on occasion. As an example, he wanted to come to Mary and Ella's house when the youngest child was sick, but she wouldn't let him come to the house. She wasn't comfortable with that. The evidence and testimony he'd asked for additional time, you know, related around holidays. Other examples are included in the e-mail. So there was evidence that David was asking for more time. Also, David filed a motion to modify asking for more time, and that was obviously in relation to this whole issue of relocation, wherein Mary and Ella pled that one of the reasons that she needed to relocate, she wanted to find a job, and because she was the primary caregiver of the children, she wasn't able to do that. She needed to be able to have a better support system. All of these things are things that she asked for. David's motion to modify responded to that by saying, look, I can help you with that. Give me more time. I'm there to help you with the kids. I want more time. I want to be here for my kids. You can get a job, you can stay, and we can make this work, essentially. So I don't believe that the evidence at all demonstrated that David was not consistently asking for more time. I think also, you know, in its analysis, the court never really did discuss, and I think the factor that we're talking about here is that third factor, whether or not a parent has substantially failed to exercise their time. The court basically found that David never did not substantially exercise his time. He did exercise his time. There were three, I would say, incidents that the court really focused on in making some broad, generalizing statements about David's, you know, interaction and involvement with the children that I do want to discuss today because I think those are important. But he had been consistently asking for more time. And essentially what we did, and by the court's focus on this idea of having to consistently ask for more time, is we flipped that factor sort of upside down on its head. It's not talking about whether or not we, what the factor says and what the statute says is whether or not somebody substantially exercises their time. We flipped it around to say, are you begging for more time, essentially, from the other parent? Are you always asking, consistently asking for more time from the other parent? I don't believe that's a reasonable request of our parties. We do have to honor, in my courts, our parties have to honor the trial court. And certainly the trial court in this case awarded Mary Anella what she asked for. She wanted David to have every other weekend, one day a week. And that's what she got. In terms of that, and that's another thing I want to hit on at this point, which is that Mary Anella, I think the court found in its analysis, stated that she was unemployed, not able to support herself. And the court in its findings essentially stated that she's not going to be able to be a stay-at-home mom and care for the kids the way she has traditionally unless she's able to go to North Carolina. And I think I want to let that sink in for a moment, which, you know, it's a little bit concerning to me, I think, and as to a lot of litigants and hopefully to the court, that we are putting, that we're sort of elevating that idea that it's better for kids to have a stay-at-home parent and somebody take care of them in that way. And that's one of the concerns that we had with respect to the court's decision on this. And I think the evidence in this case definitely demonstrated that, you know, Mary Anella certainly did have resources here. She received approximately $61,000 from the divorce and additional $40,000 from David for the equity in the marital home. She had been recently employed. As of the date of the trial, she had only been unemployed for approximately one to two weeks. She'd had a recent employment. There was other evidence that during the course of this litigation, Mary Anella was employed by a particular employer, I think it was AutoZone, and suspended that employment because of summer vacation for the kids. She admitted she didn't have any discussions with David about wanting to continue the employment in any way, but just stopped working. Also, I mean, she admitted that the recent employment really had no effect on the care of the minor children. And, in fact, David had assisted by making sure that one of the kids got picked up early on occasion when requested by Mary Anella. The other piece to this, Your Honor, is the court talks about Mary Anella's inability to support herself. We want her to be a stay-at-home mom, continuing the tradition of caring for the children. And this is as if this becomes the reason why we want to move the kids. I mean, really, essentially, when we talk about the benefits that could impart to the children, Judge O'Sullivan, there really wasn't a lot of benefits, and it was inherently for the children. These were not better schools. It was not a better metropolitan area. I mean, the schools were both of them were gifted, very well gifted, exceptional children. Math science gifted. The eldest child was for the eighth grade valedictorian that year when we tried this case. The eldest child just recently won her spelling bee. So, I mean, these kids were doing fine where they were. And the issue here is that when we look at this analysis, we're essentially stating that because of the situation that Mary Anella asked to be put in, in other words, she requested the schedule, what she had from the trial court, because of this, now we have to move these children to North Carolina. So it ignores the fact that these are the things, this is the situation was specifically designed such that it comported with what it is that she asked the trial court to do. But when asked on cross-examination, it wouldn't be, isn't it accurate to say that if you David got more time here, you would be able to do these things. You would be able to seek better employment. You'd be able to go out there and find maybe a part-time or a full-time job. She said yes, but that's not what she wants. And that really gets down to the heart of where I think the court in making this argument about her not being able to continue in this tradition of caring for the children missed the mark. That this was a situation that was created by her. She wanted this. Did mom stay here an extra year to allow for some counseling or it seemed like I recall something about a relationship with that child and dad. Was there something about she actually held off on the petition? That decision was made collectively. I think we all made that decision. In other words, mom made it because at the time, the guardian ad litem's recommendation was that, and you can see it in the guardian ad litem's first report, it may be difficult to get a child on a plane if she's not seeing her father right now. And so in that sense, it didn't make sense to try the case at that point. I think the court's position and I think our positions were that, you know, that would be denied and we would just be facing another relocation in a year seeing how that relationship evolved. I think the court raises a good point about the relationship between David and the eldest child. Certainly that was strained for a period of time. David did everything that he needed to do to repair that relationship. And I think the testimony from the hearing that we had was that kind of flipped like a switch. It was like all of a sudden I'm not going to see my dad and all of a sudden I am. And it just started right back up again. And David's testimony was that he felt that their relationship was stronger than ever. So when we look at the situation, you know, Mary now wants to move. All of her reasons are sort of set up by the fact that this is what she asked for in the divorce decree. David, on the other hand, does his effort to repair this relationship, do what he needs to do, and at the end of the day, his kids go away. And so he really went above and beyond to try to repair that relationship with Mary, and at the end of the day, lost the children in terms of being able to be involved with them on a week-to-week basis. The other thing I wanted to make sure to point out to the court was the facts of this case are strikingly similar to Eckert, which has been a consistent guiding sort of case in Illinois law. And while the Eckert factors have been replaced under the relocation statute, there are several factors under Eckert that were sort of brought into that. And one issue here, I think, from Eckert in particular was in that particular case, we had a situation where a mom wanted to move to, I think, Yuma, Arizona, you know, because she felt that the employment opportunities would be better there. From the facts and circumstances of our case, it was clear that Ms. Marianella had looked in her immediate geographical area for jobs, but had not looked outside of her immediate geographical area for potential positions. So not looking into the entire St. Louis area. She's a Spanish-speaking individual, so she wanted to testify that she'd reached out to an organization in North Carolina where it was a literacy council. In other words, working with folks that did not, where English was not their first language and assisting with that. When I asked her whether or not these things were, you know, available to her in St. Louis, she had no knowledge. So I apologize, Your Honor. I obviously didn't get all the way through my argument, so I apologize. Thank you, Your Honor. I'm sorry. I have terrible allergies today. May it please the Court opposing counsel. My name is Barbara Scherr, and I represent Petitioner Eppeline Marianella Williams, who now goes by Marianella Balmer, but to make it easy, I'm going to call her Nella because that's what everybody calls her other than her two daughters. Your Honor, we are asking the Court to affirm the trial court's decision in all respects and hold that the trial court's decision allowing the minor children to relocate to North Carolina with their mothers so she could live with her new husband and provide better care to the children was not against the manifest weight of the evidence. We're also asking the Court to affirm that the trial court did not abuse its discretion in awarding attorney's fees in Nella's favor and that ruling did not contradict prior orders. Additionally, there is an issue possibly up on appeal about child support. We briefed it. However, we did indicate in our brief that the issue of the child support rearage calculation is not properly before you on appeal. I know that a motion was filed by opposing counsel shortly after we filed our brief asking to amend their notice of appeal, and we filed a response to that. We haven't gotten a ruling on it, so I'm just bringing that to the Court's attention. Any motions, we're taking with the case. I kind of assume that just based on my prior experience, but I would say that Rule 302B of the Illinois Supreme Court rules specifically indicates that you need to give written notice of what the issues are that are up on appeal and filing a motion to amend it, what was it, roughly 16, 17 months after the notice of appeal is not proper. If Rule 302B means anything, it means that you're supposed to give written notice of the issues you're going to appeal, not oral notice. Your Honors, the standard for review for what I would view as probably the biggest issue before us, meaning the relocation of the daughters to North Carolina, is whether or not Judge Gomerich's decision was against the manifest weight of the evidence. It's not against the manifest weight of the evidence. I feel that there's a gross minimization of the three days, two and a half days of testimony that you can see in front of you in the transcripts, plus the evidence, the exhibits that were admitted, as far as Judge Gomerich's decision on the relocation, by the evidence. There's no way to read through that transcript and say, huh, an opposite decision was clearly apparent. Not only does the evidence support allowing relocation, when you look at the 11 factors under 609.2, it's overwhelmingly in support of it. Ms. Wood makes an argument that Mr. Williams's petition for modification that he filed in 2015, filed it shortly before the IMDMA was revised roughly two and a half, three months later. I feel like he filed it in early to mid-October. The IMDMA, the portion regarding modification of what used to be known as custody, now is called parental allocation of responsibilities and time, and I simply refer to it as a schedule, changed about two and a half months after he filed. The time he filed this, since it was less than two years after the prior order on parenting time, technically, besides a substantial change of circumstances, there should have been an indication that there was some endangerment to the children. We didn't address that. The statute was getting ready to change. By the time we had gotten into court, it would have changed anyway. However, he says a lot in his pleadings. He relies on his pleadings. But just because you put something in a pleading, and I'd also like to add that Judge Gomelich, in her oral ruling on April 28, 2017, does mention, she says something to the effect of the pleadings are actually even deficient to plead a substantial change in circumstances. He really didn't plead anything that had changed since the May 2014 order in the dissolution and when the parties, when the custody, initial custody order, scheduling order, however you prefer to call it, was made. But the argument that filing for relocation, and again, when Nella filed this in, I think we filed on March 2nd of 2015, when she filed it, she filed it as removal because that's what we called it at the time. But when we heard the case, it was relocation. And we decided it under the relocation statute. That's how it was decided. The relocation statute indicates that relocation in itself is a substantial change in circumstances. Neither I, nor any of my law clerks, and neither has Ms. Wood found any case that indicates filing a petition for relocation is a substantial change in circumstances. I did want to point that out to the court. And if that were the case, it would probably dissuade a lot of people from filing for relocation. Asking a court for relief on a particular issue does not mean that there's a substantial change in circumstances. Be that as it may, and although great weight seems to be put on the appellant with the court's comments about there were not requests for additional parenting time, which I think really was more of a passing comment from Judge Garmick, it had more to do with the fact that when Mr. Williams did exercise additional parenting time, it was at a time that was convenient for him. If you look at those emails, you'll see times that he agreed to help Nella out, and usually it was Nella requesting help. Nella needing to have surgery and having to hire a private babysitter because Mr. Williams wouldn't take a day off work but said, I can handle the girls in the evening. Nella begging Mr. Williams during a time that I would say he was under the microscope of litigation in August of 2016, during that year that there was a decision to hold off on the relocation trial because the relationship needed to be repaired. During that time period, she's begging him, it was late August of 16, I think it was August 28th, but whatever, begging him for help. The younger daughter's sick, I need help. He's over walking around Festival of Nations drinking beer. I think the court's point, the trial court's point about a few passing comments about not asking for additional time was that yes, he was exercising his time, but he was doing the bare minimum. When help was needed by Nella, who had no resources out here, it was okay if it was convenient. And being a parent is not about a convenient. Anybody who thinks that you have a child because it's going to be convenient or easy is making a poor decision. In either event, Judge Roberts made a passing comment when she gave her oral ruling about, Mr. Williams, I understand that you don't like what happened in 2014 and that you want essentially a do-over. I can't offer that to you. And with all due respect to Judge Garmick, she did give him the do-over. Even though she did indicate that his pleadings were deficient and that he hadn't proven the modification, everything that was presented during those three days of testimony would have been the same evidence that you had presented for the modification. So she heard everything. And he still didn't prove by preponderance of the evidence that there was a substantial change in circumstances warranting a change in the parenting time schedule. I believe he was asking essentially for a 50-50 schedule. I think he wanted an extra day during the week to make his weekend a three-day weekend and then to do week on or week off during the summer. But it just wasn't there. And to say that the evidence was totally contrary to the decision is really a minimization of what the evidence was that was presented during that three-day trial. Also, when we're looking at the manifest way to the evidence standard, I mean, the cases that we have before us are instructed that you give great deference to the trier effect, to Judge Garmick. She was there. You get to read the transcripts. So you get to read words. But unfortunately, you don't get to see the pauses between answers. You don't get to see the reactions of the litigants to judge vote credibility by facial expressions and such, which is probably part of the reason that we give great deference to the trier effect. Judge Garmick got to see that. She also didn't get to see it during three days of trial. She had been intimately familiar with some of the things that had occurred in other aspects of the litigation, basically I guess from the fall of 15 through the time we tried this case, I don't know, what was it, 18, 19 months later in the spring of 17. She had the opportunity to judge Mr. Williams' credibility. There was a whole issue regarding the sale of the house and or the refinancing of the house. We went for months with my client not being paid her share of the equity out of the house with Mr. Williams first saying he couldn't refinance it and then he needed certain things to refinance it. We were back and forth in court until finally Judge Garmick, who refers to this in her oral ruling from April 28th, finally pulled myself, opposing counsel and the GAL back into chambers and said let's get this individual, I can't remember if it was a lending institution or who was going to do the refinancing on the phone. And she refers to this. She finds out that there really was not only one option for the refinancing. There were several but Mr. Williams only wanted one of them. She refers to that in her oral ruling. We also can see that Judge Garmick had a chance to judge Mr. Williams' credibility regarding the issue of the breakdown in his relationship with the oldest daughter. I believe it was in the fall of 15 there was an incident where Mr. Williams spanked the oldest daughter and you're probably familiar by now with the fact that the oldest daughter has a very mild and extremely highly functioning form of Asperger's. She is incredibly intelligent but socially there have been some issues. She had been in counseling. There had been essentially for lack of a better term a pact or promise in counseling that he would no longer spank her or use physical discipline. And he used it again. He did. And there was a breakdown in the relationship to the point that the older daughter just patently refused to spend time with him other than minimal time. And during trial Mr. Williams denied that. He denied that there had been any promise. The GAL testified contrarily and you can see from Judge Garmick's testimony that she remembers this. She remembers the hearing I guess it was from the fall of 15 or early 16 where this was discussed. Where the GAL spoke about the fact that there had been the breakdown in the relationships between Mr. Williams and his oldest daughter was because he had violated this pact. So the comments that are made by opposing counsel that during that year that we waited to try this case Mr. Williams worked really hard. He really put his all into repairing his relationship with the oldest daughter. He's the one who caused the breakdown and the rift in that relationship in the first place. He did need to parent her. Noah on the other hand was more concerned about her daughters and about repairing the relationship between the oldest daughter and the father. I mean frankly I think what she did was fairly selfish. She waited yet another year to be able to move to North Carolina or at least to have the court make the decision as to whether or not she could move the girls to North Carolina. She stayed here. So I'm arguing these points here just in support of the fact that the manifest way to the evidence, it's there. The preponderance of the evidence, the factors were there to support relocation if you look at the 11 factors. There was also great work made of the fact that this move benefits Noah. Well obviously it does. A parent doesn't file for relocation most parents who file for relocation are doing it because there's something going on in their own personal life. The main reasons people file for relocation are a job or career opportunity or I guess schooling like you have in the Kopchak case. The Kopchak case which is one of the more recent cases under the relocation statute which has a lot of factual similarities to this case and I'm not talking about the fact that the mom in Kopchak, the relocating parent wanted to move to North Carolina also. But it was a case where relocation had been discussed prior to the divorce. The relocating parent in that case had wanted to move to North Carolina for a while to complete I believe it was a Ph.D. program that would have allowed more latitude in her schedule to be an at home parent. It was a case where unlike this case you had a father in that case that really was actively involved and really did not only exercise all of his parenting time but really went beyond the call of whatever his parenting time was to be actively involved with that child. But my point being that when parents ask to relocate it's usually because of something that's going on in the parent's life. They get remarried. They have a job opportunity. I mean sometimes we have military but that's not what the case is here. So to criticize Nellis we've seen throughout this case for almost doing this in a clandestine manner because she got engaged to her current husband not too long after the 2014 the spring of 2014 dissolution of marriage really is not an issue for the court to consider. Does the court have any questions? Thank you counsel. Thank you. I want to address a few issues that counsel brought up during her argument. I want to talk about these instances. Counsel's I think qualified in the way the trial court had misstated the facts and the circumstances. It was about David just failed to be involved. He was not an involved parent. In other words he didn't help out when asked. He didn't do things that he would assist when she would ask him. There were literally three instances where we during the course of this case that we talked about instances where David had allegedly failed to assist Ms. Marianella with the children. One was related to the surgery. So in other words the trial court found that David basically refused to assist Ms. Marianella on the day that she was supposed to have surgery by taking care of the children. That was not the evidence that was presented. And in fact Ms. Marianella was given the opportunity to provide e-mail evidence after the fact to show, to definitively demonstrate that I sent David another e-mail where I said I can't get coverage and he refused or didn't respond. That was never offered to the court. Marianella did provide additional e-mail evidence but that e-mail was not included in there. And David's testimony was that I had told her, and you can see it in the other e-mail evidence, I had told her that I would assist, see if you can maybe get a babysitter for this period of time. I'm sure the courts reviewed the entire record and would see that David does not have an unlimited amount of time, you know, to be off work. At that time he was obligated for both a child support and a maintenance obligation so he needed to work. And as he testified, that day he couldn't assist because he himself had his presentation at work. So it just happened to be an unfortunate circumstance. The second circumstance that we talked about was this idea that David had refused to help get the older child to school in the morning because the other child was sick. David didn't testify that he refused. That's not what the evidence was. The testimony and evidence was that Marianella had sent a text message that night, he just didn't see it until the next morning. At least to say that he refused to assist is not correctly stating what the facts and the evidence were. And then with respect to this whole issue of the medical emergency, the appendicitis, both parties admitted on the stand that Marianella admitted that she didn't really convey the seriousness of the condition. She was essentially asking for supplies. And she and David admitted that he didn't understand the seriousness of the situation. He was far away. He saw a request for supplies. He didn't understand what was going on. I think the issue is here, Your Honors, is that this child was suffering from appendicitis. They waited so long that her appendix actually did burst. So she had to get emergency care. But the trial court drew all negative inferences against David in that situation as opposed to looking out for what it was, which is a situation where neither parent knew exactly what was going on. But at the end of the day, both of them were in the emergency room with her. Both of them spent the entire night with her in the hospital. So these three instances are what the Court used as a general statement to apply to the situation that David just wasn't uninterested in and didn't help, that he wasn't involved with his children. And that certainly was not what the evidence was. As to the issue of credibility, when we have a situation where we have to weigh the testimony of one party versus the other, I agree. Credibility would be an issue there. But here, the facts and the evidence don't demonstrate that David is not an involved parent. In fact, he is a very involved parent. He assiduously exercised his time. And that's the factor that we focus on. Not whether or not he jumped when you asked him to jump or if he felt that maybe he didn't do a great job on that day in the hospital. That's not what we're talking about here. We're talking about, does he exercise his time? And there was certainly plenty of evidence and testimony, which the Court didn't even discuss, where it talked about David's relationship with his children, that he taught them to play piano, that he's taught them to play chess, that he reads to them every single night, that they do prayers every single night, that they eat together, that they discuss politics. They talk about penguins. They have all kinds of different things that they are involved together with. And his relationship with these two girls is very close. But that was not discussed. As to the issue of the, I want to discuss briefly the issues related to the two orders. I think the orders speak for themselves. They address the issue of retroactivity as to the issue of child support, reserves a potential refund in 2016 as something that might be paid back to Marianella as a result of that child support ruling. The other order specifically related to attorney fees, related to child support, which necessarily flows that if we're going to be you agree that you're going to take on your child support and all of these others I think it was related to pension, several other matters, you agree that you're going to be responsible for those, we can't then just parse out, okay, you said you're going to be related to child support, but now I'm going to dig in here and just tease out this piece related to the compelling discovery issues. It's unfair and it's the intent of the parties to resolve that issue, to go backwards in time on all of these things, to ignore the plain language and the overall intent of the parties in those agreements is not correct and it was an incorrect ruling by the court. We believe Your Honor, again, that the evidence that was presented here is clearly you can look at the testimony and the evidence and it's clear and we're asking the court to, again, reverse and back to the child support. Okay, thank you counsel for your arguments. The court will take this matter under advisement under a decision in due course.